*This opinion is subject to administrative correction before final disposition.*

# United States Navy–Marine Corps
# Court of Criminal Appeals

Before
WOODARD, FULTON, and CRISFIELD,
Appellate Military Judges

_____

**UNITED STATES**
Appellee

**v.**

**Stephen P. HOWELL,**
Staff Sergeant (E-6), U.S. Marine Corps
*Appellant*

**No. 201200264**
_____

Decided: 12 June 2019.

Appeal from the United States Navy-Marine Corps Trial Judiciary upon further review. Military Judge: Lieutenant Colonel David M. Jones, USMC. Sentence adjudged 29 April 2015 by a general court-martial convened at Marine Corps Recruiting Station Parris Island, South Carolina, consisting of officer and enlisted members. Sentence approved by the convening authority: Reduction to E-1, forfeiture of all pay and allowances, confinement for nine years, and a dishonorable discharge.

For Appellant: Captain Thomas R. Fricton, USMC.

For Appellee: Captain Brian L. Farrell, USMC; Lieutenant Kimberly Rios, JAGC, USN.

Judge CRISFIELD delivered the opinion of the Court, in which Chief Judge WOODARD and Senior Judge FULTON joined.

_____

**This opinion does not serve as binding precedent, but may be cited as persuasive authority under NMCCA Rule of Practice and Procedure 30.2.**

_____

CRISFIELD, Judge:

A general court-martial panel convicted the appellant, contrary to his pleas, of one specification of violating the Joint Ethics Regulation, a lawful general regulation; one specification of abusive sexual contact by touching the body of the victim, D.S., while placing her in fear of physical injury other than death or grievous bodily harm; one specification of wrongful sexual contact by touching the body of D.S. without legal justification or lawful authorization and without her permission;[1] and one specification of adultery, in violation of Articles 92, 120, and 134, Uniform Code of Military Justice (UCMJ).[2]

The appellant was first tried on these charges in 2012 and convicted. Due to our determination that unlawful command influence tainted his court-martial, however, we set aside the findings and sentence and authorized a rehearing. *United States v. Howell,* No. 201200264, 2014 CCA LEXIS 321 *38 (N-M. Ct. Crim. App. 2014). The appellant was retried and convicted, and this appeal ensued.

The appellant asserts thirteen assignments of error (AOEs): (1) the military judge erred by admitting testimony regarding the appellant's risk of recidivism; (2) the military judge abused his discretion by denying the defense motion for a mistrial; (3) the military judge committed plain error by admitting presentencing testimony recommending three to five years of confinement; (4) the trial counsel's sentencing argument was improper; (5) trial defense counsel was ineffective for failing to interview the government's expert witness before trial or take a continuance to prepare for his cross-examination; (6) the military judge abused his discretion by allowing the victim's testimony to be improperly bolstered; (7) the military judge abused his discre-

---

[1] The military judge conditionally dismissed this specification (Charge II, Specification 5) after the announcement of findings, finding that the specification arose from the same conduct as the abusive sexual contact conviction (Charge II, Specification 4).

[2] 10 U.S.C. §§ 892, 920, and 934 (2008). The appellant was charged with, but acquitted of, rape, sexual assault, aggravated sexual contact, sodomy, and assault consummated by a battery.

tion when he refused to admit defense exhibits summarizing the victim's text messages; (8) the military judge abused his discretion by denying the appellant's request to admit evidence of the victim's knowledge of her husband's infidelity; (9) there was undue post-trial delay which violated *United States v. Moreno*, 63 M.J. 129 (C.A.A.F. 2006); (10) the abusive sexual contact and wrongful sexual contact convictions are factually and legally insufficient; (11) the sentence was inappropriately severe; (12) trial defense counsel rendered ineffective assistance of counsel by conceding the appropriateness of a punitive discharge; and (13) there was cumulative error requiring us to set aside Charge II and the sentence.

We find no merit in any of the AOEs and affirm the findings and sentence.

## I. BACKGROUND

The appellant was a Marine Corps recruiter in Lexington, Kentucky. He met the victim, D.S., when D.S.'s son became a Marine recruit. The victim was a police officer in Lexington. She went to the appellant's office and met him for the first time in November 2010 to sign enlistment papers for her son, who was seventeen. Soon thereafter, the appellant began sending D.S. anonymous flirtatious text messages. Between 15 December 2010 and 22 February 2011, the appellant used his government cell phone to send those text messages. In February 2011, shortly after D.S. separated from her husband and moved into a new house by herself, the appellant identified himself in a text as the person sending the flirtatious texts. D.S. informed the appellant that she had moved from her old address and the appellant asked for her new address, which she sent him. The appellant asked D.S. to meet with him, but D.S. would not.

On 22 February 2011, the appellant sent a text message to D.S. from a strip club expressing his sexual interest in her and proposing that he come over to her house so they could have sex. D.S. declined the appellant's proposal but offered to drive him from the strip club to his home in her police patrol car so he would not have to drive after drinking. The appellant refused her counter-proposal and continued to propose that he come to her house. She in turn continued to decline his offer. At about 0400, after the appellant left the strip club, he contacted D.S. while driving down her street. The appellant asked which house D.S. lived in and D.S. gave him her address because, according to her, she did not want to be responsible for the appellant having an accident. At trial, the victim indicated that her goal was to get him off the road, and not to have a sexual encounter with him.

The appellant turned into the victim's driveway and parked behind her police car. He then went to the victim's front door. The victim opened the door

and the appellant immediately and forcefully hugged her and kissed her. He picked her up, carried her to her bedroom, took off her clothes, and began touching her genitalia and inserting his fingers and penis in her vagina, mouth, and anus. The appellant also hit the victim on her buttocks and thighs, leaving bruises. D.S. did not consent to any of these activities. She repeatedly told the appellant to stop, but he continued touching her. At some point, D.S. said she was in pain and asked if she could get something to provide lubrication for sexual intercourse. The appellant agreed. D.S. went alone to her kitchen while the appellant remained in the bedroom. She retrieved cooking oil to use for sexual lubrication. She did not try to escape from the house, call the police, or get her police pistol during this brief reprieve. She returned to the bedroom and spread vegetable oil over the appellant's penis and her vagina. The sexual activity continued. At 0730 the appellant asked D.S. what time it was. She informed him of the time and the appellant said he had to go to work. He took a shower in D.S.'s bathroom and then departed.

Later that morning D.S. deleted all her text messages with the appellant and others, including her patrol partner from the Lexington police force, Officer Hart. She then called Officer Hart. He came to her house and she showed him some of her bruising, but denied that she had been raped. Officer Hart advised her to go to the doctor and get a sexual assault examination. D.S. went to see her gynecologist the next day, 23 February 2011. Her gynecologist advised her to see a sexual assault nurse for a sexual assault nurse exam (SANE), which she did later that evening.

Officer Hart alerted law enforcement to the alleged assault and Naval Criminal Investigative Service (NCIS) opened an investigation on 24 February 2011. D.S. sent her cell phone to NCIS for their forensic examination, but NCIS was unable to retrieve the text messages between the appellant and the victim that D.S. had deleted. NCIS was able to recover some of the text messages between Officer Hart and D.S., even though D.S. also deleted those messages following the sexual assault. D.S. made a sworn statement to NCIS on 24 February 2011.

Additional facts necessary to resolve the AOEs are recited below.

## II. DISCUSSION

### A. Expert Testimony on the Appellant's Risk of Recidivism

The prosecution called a military forensic psychiatrist, Captain Simmer, USN, to testify in the pre-sentencing hearing about the victim's post-traumatic stress disorder (PTSD) and the appellant's risk of recidivism. The trial counsel had notified the defense team that Captain Simmer would provide testimony regarding PTSD, but not that he would testify about recidi-

vism. When the trial counsel started asking questions about recidivism, the defense counsel objected, citing a lack of notice and preparation for that part of the witness' testimony. The military judge asked the defense, "Are we going to talk about *Daubert*?" The trial defense counsel's response clearly indicated that his objection related solely to the lack of notice and discovery.

Recognizing the legitimacy of the defense's discovery concern, the military judge allowed the defense to voir dire Captain Simmer outside the presence of the members to preview his testimony. The government intended to introduce Captain Simmer's "Static-99R" analysis as a basis for his opinion on risk of recidivism. Static-99R is an analytical tool designed to measure the risk of recidivism for sexual crimes. The military judge prohibited the government from asking Captain Simmer any questions on direct examination regarding the risk of recidivism until Captain Simmer provided his Static-99R analysis to the defense team and the defense had time to prepare cross-examination. The military judge also ordered that no questions about recidivism would be asked until the next day in order to give the defense time to prepare.

After a short break during which they reviewed Captain Simmer's expected testimony, however, the trial defense counsel informed the military judge that the defense preferred to proceed immediately with Captain Simmer's testimony on risk of recidivism. The military judge clarified the defense request: "You don't need a break until tomorrow; is that correct?" The defense counsel stated, "That is correct, sir." The pre-sentencing hearing then proceeded with direct and cross-examination of Captain Simmer in front of the members.

After the conclusion of the court-martial, but before the military judge authenticated the record of trial, the appellant filed a post-trial motion to exclude the pre-sentencing testimony of Captain Simmer based on MILITARY RULE OF EVIDENCE 702 (MIL. R. EVID.), MANUAL FOR COURTS-MARTIAL, UNITED STATES (2012 ed.); *Daubert v. Merrell Dow Pharm.,* 509 U.S. 579 (1993); and *United States v. Houser*, 36 M.J. 392 (C.M.A. 1993). The military judge denied the motion after allowing the issues to be litigated in a post-trial Article 39a, UCMJ, session.

On appeal, the appellant alleges that the military judge erred in two respects. First, by allowing Captain Simmer's expert testimony on recidivism when the government had not provided advance notice to the defense about the testimony. Second, by allowing Captain Simmer to render an expert opinion that departed from the limits of the Static-99R tool.

With regard to the first issue, we find that the military judge made reasonable rulings in response to the appellant's timely objection to lack of notice and discovery, providing several of the remedies allowed under RULE FOR COURTS-MARTIAL 701(g)(3) (R.C.M.), MANUAL FOR COURTS-MARTIAL, UNITED

STATES (2012 ed.), for a party's failure to comply with discovery rules. The military judge allowed the defense to voir dire the witness outside the presence of the members and prohibited the trial counsel from asking questions about recidivism until the defense had had time to review the witness' opinion and craft its cross-examination questions. The military judge granted an overnight continuance to give the defense time to prepare. The defense counsel's subsequent request to proceed immediately with cross-examination waived any further complaint regarding the lack of discovery. *United States v. Gladue*, 67 M.J. 311, 313 (C.A.A.F. 2009).

With regard to the second issue, the appellant failed to make a timely *Daubert* objection. MIL. R. EVID. 103(a) ("A party may claim error in a ruling to admit . . . evidence only if . . . a party . . . timely objects . . . ."). When the military judge specifically asked defense counsel if he was objecting to Captain Simmer's testimony under *Daubert,* the defense counsel stated that his objection was to lack of discovery. The military judge then confirmed the nature of the objection: "So the issue here is discovery." The defense counsel did not correct the military judge. As the military judge determined in his post-trial conclusions of law, "[t]he issue for the defense at trial was that they were surprised that CAPT Simmer would discuss recidivism, not that the underlying scientific moorings of his testimony were invalid."[3] We concur with the military judge's conclusion.

Since the defense did not make a timely *Daubert* objection, normally this issue would be waived. MIL. R. EVID. 103(a)(1)(A); *United States v. Youngberg,* 43 M.J. 379, 387 (C.A.A.F. 1995).[4] However, the military judge chose to exercise his discretion to allow the defense to litigate the issues in a post-trial Article 39(a) session over two months after adjournment. Accordingly, under the circumstances of this case, we will review the military judge's ruling on the *Daubert* issue for abuse of discretion. *See United States v. Thomas*, 49 M.J. 200, 202 (C.A.A.F. 1998).

"A military judge abuses his discretion when: (1) the findings of fact upon which he predicates his ruling are not supported by the evidence of record; (2) if incorrect legal principles were used; or, (3) if his application of the correct legal principles to the facts is clearly unreasonable." *United States v. Ellis*, 68 M.J. 341, 344 (C.A.A.F. 2010). A military judge has a "range of choices and will not be reversed so long as the decision remains within that range."

---

[3] Appellate Exhibit XCIII at 15-16.

[4] See also R.C.M. 905(e): "[O]bjections . . . must be raised before the court-martial is adjourned for that case and, unless otherwise provided in this Manual, failure to do so shall constitute waiver."

*United States v. Sanchez*, 65 M.J. 145, 148-49 (C.A.A.F. 2007) (citations and internal quotation marks omitted).

We review *de novo*, however, the question of whether the military judge properly followed the *Daubert* framework and performed his role as gatekeeper. *United States v. Flesher*, 73 M.J. 303, 311 (C.A.A.F. 2014). Under *Daubert*, the military judge acts as a gatekeeper, "ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." 509 U.S. at 597, *quoted in United States v. Griffin*, 50 M.J. 278, 283-84 (C.A.A.F. 1999). If the military judge properly performs his gatekeeping function and follows the *Daubert* framework, we "will not overturn the ruling unless it is 'manifestly erroneous.'" *Griffin*, 50 M.J. at 284. Indeed, the military judge "enjoys a great deal of flexibility in his or her gatekeeping role: 'the law grants a [trial judge] the same broad latitude when [he] decides *how* to determine reliability as [he] enjoys in respect to [his] ultimate reliability determination.'" *United States v. Billings*, 61 M.J. 163, 167 (C.A.A.F. 2005) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 142 (1999)) (emphasis in original).

In the post-trial motion, the military judge made extensive findings of fact and conclusions of law, which he documented in a 24-page memorandum.[5] We have reviewed his findings of fact and have determined that they are supported by the evidence in the record. We also find that his recitation of the *Daubert* and *Houser* principles are correct and constitute the correct analytical framework for this issue. The military judge did not abuse his discretion in permitting Captain Simmer's testimony.

## B. The Appellant's Post-Trial Motion for a Mistrial

As part of his post-trial motions, raised over two months after his courtmartial adjourned, the appellant moved for a mistrial. For the reasons stated above, we would ordinarily find that the appellant has thus waived appellate consideration of his untimely motion. We do not do so under the circumstances of this case because the military judge exercised his discretion under R.C.M. 915(a) to entertain the defense motion in a post-trial Article 39(a) session.

The appellant claims the military judge should have granted a mistrial at the appellant's post-trial mistrial motion for three reasons: First, he asserts the trial counsel violated the rules of discovery during the trial by failing to disclose his intention to elicit testimony from Captain Simmer on the appellant's risk of recidivism. Second, the appellant claims the government violat-

---

[5] Appellate Exhibit XCIII.

ed his Fifth Amendment right to remain silent by allowing Captain Simmer to see his medical record, which included non-responsive statements to psychologists. Finally, he asserts the government violated his psychotherapist-patient privilege.

"We will not reverse a military judge's determination on a mistrial absent clear evidence of an abuse of discretion." *United States v. Ashby*, 68 M.J. 108, 122 (C.A.A.F. 2009) (citing *United States v. Rushatz*, 31 M.J. 450, 456 (C.M.A. 1990)). A military judge "may, as a matter of discretion, declare a mistrial when such action is manifestly necessary in the interest of justice because of circumstances arising during the proceedings which cast substantial doubt upon the fairness of the proceedings." R.C.M. 915(a). But, "a mistrial is an unusual and disfavored remedy. It should be applied only as a last resort to protect the guarantee for a fair trial." *United States v. Diaz*, 59 M.J. 79, 90 (C.A.A.F. 2003). "A curative instruction is the preferred remedy, and the granting of a mistrial is an extreme remedy which should only be done when 'inadmissible matters so prejudicial that a curative instruction would be inadequate are brought to the attention of the members.'" *Id.* at 92 (quoting R.C.M. 915(a), Discussion). We find the military judge did not abuse his discretion by denying the request for a mistrial.

Pertaining to the alleged discovery rules violation, the appellant claims he was not provided sufficient time to prepare for the expert's testimony on recidivism. Captain Simmer testified during both the case-in-chief and pre-sentencing. Prior to the trial, the trial counsel and Captain Simmers told the defense that the expert's planned testimony was on victim impact. That was, indeed, the focus of his testimony during the case-in-chief. As discussed *supra* however, Captain Simmer's pre-sentencing testimony widened into the appellant's risk for recidivism.

To the extent that it was an error for the trial counsel to fail to provide advance notice to the defense that he intended to elicit risk of recidivism testimony from Captain Simmer, the military judge's remedial actions were sufficient to prevent any prejudice to the appellant. The defense affirmatively waived the issue by declining to take advantage of the additional preparation time offered by the military judge. Under these circumstances, we find that the military judge acted well within his discretion in denying the post-trial motion for mistrial.

Next, the appellant claims his right to remain silent was violated when Captain Simmer was allowed to consider the appellant's lack of response to psychologists' questions in Fort Leavenworth in formulating his opinion. This case is strikingly similar to *United States v. Scott,* 51 M.J. 326, 329 (C.A.A.F. 1999), in this respect. There, a witness qualified as an expert in the area of rape trauma formulated an opinion based on a psychiatrist's report of his ex-

amination of the accused. Scott did not object to the expert using this report and the statements contained therein. On appeal, Scott raised Fifth and Sixth Amendment challenges to the expert's utilization of his psychiatric evaluations. The Court of Appeals for the Armed Forces (C.A.A.F.) determined that Scott forfeited this issue, absent plain error. *Id.* at 330; Mil. R. Evid. 103. Evaluating for plain error, C.A.A.F. determined there was no error because Scott's claim that the expert inappropriately used his psychiatric report was unsubstantiated. *Scott*, 51 M.J. at 330.

As in *Scott*, the appellant did not contemporaneously object to the admission of Captain Simmer's testimony on Fifth Amendment grounds. The defense only objected to a lack of discovery regarding the Static-99R analysis and Captain Simmer's testimony about recidivism. Unlike *Scott*, however, the appellant raised the issue in a post-trial motion asking for a new sentencing hearing. Therefore, as we did in addressing AOE 1, we will review the military judge's ruling admitting sentencing evidence for abuse of discretion. *United States v. Stephens*, 67 M.J. 233, 235 (C.A.A.F. 2009) (citing *United States v. Manns*, 54 M.J. 164, 166 (C.A.A.F. 2000)).

A military judge abuses his discretion when he admits evidence based on an erroneous view of the law. *United States v. Lubich*, 72 M.J. 170, 173 (C.A.A.F. 2013) (citing *United States v. Freeman*, 65 M.J. 451, 453 (C.A.A.F. 2008)). The military judge found that the government never introduced any statements of the appellant through Captain Simmer's testimony. Our review of the record of trial leads us to concur with this finding. The appellant relies primarily on *United States v. Kemp*, 32 C.M.R. 89 (C.M.A. 1962) to support his proposition that the military judge erred, but in *Kemp* the government introduced evidence that specifically referred to the accused exercising his right to remain silent.[6] *Id.* at 98-9. No such evidence was introduced in appellant's trial. We also concur with the military judge's conclusion that neither the appellant's Fifth Amendment right to remain silent nor the appellant's Article 31(b), UCMJ, rights were violated during Captain Simmer's testimony. We cannot say that the military judge based these determinations on an erroneous view of the law.

Finally, we address appellant's claim that the military judge abused his discretion in ruling that the government did not violate his psychotherapist-patient privilege. A privilege is waived if the appellant consented to the disclosure of any significant part of the matter or communication under such

---

[6] "Plainly the admission of the evidence of accused's refusal to discuss the offense with the psychiatric board was prejudicial. . . ." *Kemp*, 32 C.M.R. at 99.

circumstances that it would be inappropriate to allow the claim of privilege. MIL. R. EVID. 510.

The military judge found that the appellant's behavioral health records from Fort Leavenworth were not protected by MIL. R. EVID. 513.[7] He found that the appellant waived any privilege when he signed the "Limits of Confidentiality of Directorate of Treatment Programs Information" form.[8] This form specifically states, "[i]nformation disclosed by patients to Army Medical Department health personnel is not privileged communication."[9] In the "examples" section, paragraph four, it states, "[i]f you are involved in any legal action/proceedings, your records may be subject to subpoena."[10] At the bottom of this form is the appellant's signature, dated 29 January 2013.[11] Finding no evidence in the record that the appellant's waiver of the privilege was involuntary, we agree with the military judge's determination that any claim of privilege to the matters at issue was voluntarily waived. Mil. R. Evid. 513.

After careful review of the military judge's ruling, we find that he did not admit evidence on an erroneous view of the law and therefore did not abuse his discretion when he denied the post-trial motion.

## C. Expert Testimony Recommending Three to Five Years of Sex Offender Treatment

In the presentencing hearing, the trial counsel asked Captain Simmer how long sex offender treatment would likely take for the appellant. Captain Simmer answered, "[O]n average, it will take between three and five years for treatment to be successful."[12] The defense counsel did not object to this testimony. The appellant argues on appeal that it was plain error to admit Captain Simmer's testimony on this point.

Since there was no objection from the defense, we review the issue for plain error. *United States v. Green,* 55 M.J. 76, 81 (C.A.A.F. 2001). Under the plain error standard, the appellant must show that: "(1) an error was committed; (2) the error was plain, or clear, or obvious; and (3) the error resulted in material prejudice to substantial rights." *Id.* (quoting *United States v. Maynard,* 66 M.J. 242, 244 (C.A.A.F. 2008)).

---

[7] Appellate Exhibit XCIII at 22.

[8] Appellate Exhibit XCI at 93.

[9] *Id.*

[10] *Id.*

[11] *Id.*

[12] Record at 1503.

"A decision to [allow or prohibit] expert testimony on . . . appropriateness of a particular punishment sometimes requires exercise of discretion by a military judge and usually such discretionary decisions do not constitute plain error." *United States v. Campos,* No. 200602523, 2008 CCA Lexis 7 *6 (N-M. Ct. Crim. App. 2008), unpub. op. (citing *United States v. Prevatte,* 40 M.J. 396, 398 (C.M.A. 1994)).

The expert testimony in question here is:

> Because of my assessment of the moderate risk—you can have fairly short treatment, longer treatment. And the length of treatment varies obviously from one person to the next. So I can't say—again, I can't predict the future for sure exactly how long it will take for Staff Sergeant Howell. But on average, it will take between three and five years of treatment for it to be successful.[13]

A witness may not invade the province of the sentencing authority by testifying to what is an appropriate sentence. While we recognize that the witness had immediately beforehand testified that treatment was available at the Naval Consolidated Brig in Miramar and Fort Leavenworth Disciplinary Barracks,[14] we interpret Captain Simmer's testimony not as a *sentencing* recommendation, but as a *treatment* recommendation. The expert was not making a punishment recommendation of a particular number of years of confinement, but was instead expressing his opinion as to how long a particular course of treatment for a particular patient would require. We do not find plain error in its admission.

## D. The Trial Counsel Asked the Members to Nullify Three Years of *Allen* Credit

The appellant alleges that the trial counsel committed prosecutorial misconduct during closing argument when he urged the members to increase a sentence to confinement by three years in light of the three years of pretrial confinement credit that the appellant would receive in accordance with *United States v. Allen*, 17 M.J. 126 (C.M.A. 1984).

"Improper argument is one facet of prosecutorial misconduct." *United States v. Sewell*, 76 M.J. 14, 18 (C.A.A.F. 2017) (citing *United States v. Young*, 470 U.S. 1, 7-11 (1985)). Prosecutorial misconduct in the form of improper

---

[13] *Id.*

[14] "In the military system, there is treatment available both at the Miramar confinement facility in California and also at the Leavenworth—Fort Leavenworth disciplinary guards camp." *Id.*

argument is a question of law we review *de novo. United States v. Frey*, 73 M.J. 245, 248 (C.A.A.F. 2014) (citing *United States v. Marsh*, 70 M.J. 101, 106 (C.A.A.F. 2011)). Because the appellant did not object to this argument at trial, however, we review the argument for plain error. *United States v. Halpin,* 71 M.J. 477, 479 (C.A.A.F. 2013); *United States v. Pabelona*, 76 M.J. 9, 11 (C.A.A.F. 2017).

To show plain error, the appellant must persuade this court that: "(1) there was error; (2) the error was plain or obvious; and (3) the error materially prejudiced a substantial right of the accused." *United States v. Tunstall*, 72 M.J. 191, 193-94 (C.A.A.F. 2013) (quoting *United States v. Girouard*, 70 M.J. 5, 11 (C.A.A.F. 2011)). The plain error doctrine is "to be used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result." *United States v. Causey*, 37 M.J. 308, 311 (C.M.A. 1993) (citations and internal quotation marks omitted).

In his sentencing argument, the trial counsel stated:

> Now, the accused will receive three years of confinement credit as you will see in your instructions for his previous confinement. So if you sentence him to three years or less, he will leave this courtroom today, and he will not serve anymore confinement. In order to facilitate that potential treatment, if you deem that is what he should have, you must sentence him to something beyond that three years. And thus it is the government's position that you should sentence him to a minimum of eight years of confinement: Three years for the previous confinement and five years in order to facilitate potential rehabilitation. That would be what was fair to Staff Sergeant Howell. He would be able to rehabilitate himself. He would be able to help himself prevent recidivism.[15]

The defense did not object to this argument.

Our superior court has held that pretrial confinement credit information may be used by the sentencing authority for aggravation or mitigation. *United States v. Balboa,* 33 M.J. 304 (C.A.A.F. 1991). In *Balboa*, the military judge instructed the members that the accused was entitled to 68 days of pretrial confinement that would be credited against any sentence to confinement they adjudged. The military judge also instructed the members that they should consider the duration of pretrial confinement when they deliberated on sentence. The defense counsel did not object to these instructions. The members awarded a sentence of confinement to 68 days plus 12 months, thus

---

[15] Record at 1566.

appearing to have deliberately increased the sentence to nullify the pretrial confinement credit. The C.A.A.F. acknowledged that pretrial confinement would usually be considered as a matter of mitigation. *Id.* at 307. However, the court also recognized that pretrial confinement could be a basis to *increase* a sentence:

> In any event, neither the decision of this Court in *United States v. Allen, supra*, nor the Manual for Courts-Martial precludes a court from attempting to fashion an appropriate sentence of confinement in view of time actually served. *See generally Wasman v. United States* and *Williams v. New York. . . .* In this regard, we note that the practice of automatic credit by prison authorities for pretrial confinement is favored by the American Bar Association. *See* Standards 18-4.7 and 18-6.8, Sentencing Alternatives and Procedures, 3 American Bar Association Standards for Criminal Justice (2d ed. 1982 supp.). Even these standards, however, do not require that the sentencing authority, whether a judge or a jury, be kept in ignorance of this process *or be precluded from considering this pretrial-confinement credit to increase actual confinement imposed. Cf.* Standard 18-6.8(c), ABA Standards, *supra.*

*Balboa*, at 307 (emphasis added).

Based on our superior court's holding in *Balboa*, we cannot say that it was plain error for the trial counsel to argue that the members should increase their sentence to confinement for the express purpose of nullifying the *Allen* credit determined by the military judge in order, ostensibly, to permit the appellant to complete five years of treatment. Notwithstanding the C.A.A.F.'s language in *Balboa*, however, we would not condone a trial counsel's effort to "appeal" a military judge's *Allen* or Article 13 credit determination to members.[16] Our holding might be different in a case where the issue was properly preserved for appeal.

---

[16] Senior Judge Everett observed:

> It seems curious (and more than coincidental) that the confinement adjudged was "68 days, plus 12 months"—not 14 months or 15 months—when the court-martial members knew that their announced sentence to confinement would be reduced by precisely 68 days. This Court does not need an appellate crystal ball to discern the real likelihood that, as a practical result of the members' action, appellant has been denied the legally required credit for his pretrial confinement.

*Balboa*, 33 M.J. at 307-08 (Everett, S.J., concurring).

**E. The Trial Defense Counsel were not Ineffective**[17]

The appellant alleges that his trial defense counsel were ineffective for the following reasons: (1) not interviewing Captain Simmer regarding recidivism; (2) not requesting a continuance to consult with an expert regarding the risk of recidivism; and (3) conceding, against the appellant's wishes, that a punitive discharge was appropriate.

We review claims of ineffective assistance of counsel *de novo. United States v. Harpole,* 77 M.J. 231, 236 (C.A.A.F. 2018). The Sixth Amendment entitles criminal defendants to representation that does not fall "below an objective standard of reasonableness" in light of "prevailing professional norms." *Strickland v. Washington*, 466 U.S. 668, 688 (1984). In order to prevail on a claim of ineffective assistance of counsel, an appellant must demonstrate both (1) that his counsel's performance was deficient, and (2) that this deficiency resulted in prejudice. *Id.* at 687.

With respect to *Strickland's* first prong, counsel are presumed to be competent and our inquiry into an attorney's representation is "highly deferential." *Id.* at 689. We employ "a strong presumption that counsel's conduct falls within the wide range of professionally competent assistance." *Id.* at 690. The appellant has the heavy burden of establishing a factual foundation for a claim of ineffective representation. *United States v. Grigoruk*, 52 M.J. 312, 315 (C.A.A.F. 2000). In order to show prejudice under *Strickland*, an appellant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." 466 U.S. at 694. "Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Id.* at 696.

We will not second-guess strategic or tactical decisions made by the trial defense counsel unless the appellant can show specific defects in counsel's performance that were unreasonable under prevailing professional norms. *United States v. Mazza*, 67 M.J. 470, 475 (C.A.A.F. 2009). However, a defense counsel "must perform a reasonable investigation, or make a reasonable decision that an avenue of investigation is unnecessary." *United States v. Brownfield*, 52 M.J. 40, 42 (C.A.A.F. 1999); *see also Strickland*, 466 U.S. at 691. Strategic or tactical decisions made "after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Strickland,* 466 U.S. at 690. But, "strategic choices made after less than complete investigation are reasonable only to the extent that reasonable professional judg-

---

[17] We combine here our discussion of AOEs 5 and 12.

ments support the limitations on investigation." *Loving v. United States*, 64 M.J. 132, 142 (C.A.A.F. 2006) (quotation marks omitted). To determine whether an investigation was thorough, "[w]e address not what is prudent or appropriate, but only what is constitutionally compelled." *United States v. Akbar*, 74 M.J. 364, 380 (C.A.A.F. 2015) (alteration in original) (internal citations and quotation marks omitted). The critical question, therefore, is "whether counsel made a good faith and substantive effort" to identify the witnesses and information necessary to reasonably inform their strategic and tactical decisions. *Id.* at 381. Thus, a decision by the trial defense counsel *not* to investigate will be assessed for reasonableness. *Loving*, 64 M.J. at 143.

Finally, we apply:

> a three-part test to determine whether the presumption of competence has been overcome:
>
> 1. Are appellant's allegations true; if so, "is there a reasonable explanation for counsel's actions"?
>
> 2. If the allegations are true, did defense counsel's level of advocacy "fall measurably below the performance . . . [ordinarily expected] of fallible lawyers"?
>
> 3. If defense counsel was ineffective, is there "a reasonable probability that, absent the errors," there would have been a different result?

*United States v. Gooch*, 69 M.J. 353, 362 (C.A.A.F. 2011) (quoting *United States v. Polk*, 32 M.J. 150, 153 (C.M.A. 1991)) (alterations in original).

We find that the appellant has not shown his trial defense counsel's performance to be outside the wide range of professionally competent assistance. With regard to the first allegation, trial defense counsel interviewed Captain Simmer before the trial, in the presence of the defense's expert. He did not question Captain Simmer about recidivism because the trial counsel had not notified the defense that Captain Simmer would testify about recidivism.[18] This fails to constitute a basis to find that the trial defense counsel's performance was deficient.

Once aware that the government intended to elicit testimony from Captain Simmer about recidivism, the defense counsel acted diligently by objecting to the testimony and effectively communicating his objection to the mili-

---

[18] "Admittedly, the lack of defense preparation is due to the government misleading the defense into believing that risk of recidivism would not be part of the sentencing case." Appellant's Brief at 71.

tary judge. He convinced the military judge that immediate remedial measures were necessary and questioned Captain Simmer under oath outside the presence of members to explore the basis for his opinion. This questioning, along with defense counsel's personal experience with actuarial risk assessments, was sufficient investigation to prepare for the witness' expected testimony.

We find that the trial defense counsel's subsequent cross-examination of Captain Simmer was professionally competent and effective in highlighting the weaknesses of Captain Simmer's opinion on the appellant's risk of recidivism. The defense counsel effectively dissected Captain Simmer's Static 99-R report and emphasized for the members that the appellant's actual score was "low." He also effectively attacked the expert's independent findings that increased the risk score from low to medium. He highlighted that there was little basis for the additional factors supporting Captain Simmer's risk assessment other than his opinion, and highlighted to the members the weaknesses in Captain Simmer's testimony.

The appellant also claims his trial defense counsel was ineffective because he declined an overnight recess offered by the military judge to give him time to prepare cross-examination of Captain Simmer. In his declaration, the trial defense counsel states that he now thinks it was a mistake to let one of his expert consultants fly home before Captain Simmer's testimony and to cross-examine Captain Simmer without the consultant's assistance.[19] Although the trial defense counsel may regret his decision in retrospect, we analyze his decision at the time he had to make it and decline to grant relief unless the appellant can show specific defects in counsel's performance that were unreasonable under prevailing professional norms. *Mazza*, 67 M.J. 470.

We do not find that those decisions, per se, fell "below an objective standard of reasonableness" in light of "prevailing professional norms." *Strickland*, 466 U.S. at 688. Counsel made a strategic and tactical decision to proceed immediately with the cross-examination instead of taking an overnight recess. Counsel articulated his reasoning during the litigation of the post-trial Article 39(a) motion. Specifically, he articulated his thinking at the time: "Yes, we're going to proceed forward. We're not going to ask for an overnight recess because, again, we're playing with all kinds of human factors at the end of the week-and-a-half long trial with members sitting there."[20] This included the defense's concern that they did not want Captain Simmer's "mod-

---

[19] Appellant's Brief, Appendix A, dtd. Oct. 31, 2018.

[20] Record at 1648.

erate risk" assessment on the members' minds overnight without rebuttal.[21] As discussed *supra*, his cross-examination of Captain Simmer was competent and effective. That it may have been *more* effective if he had delayed overnight to consult with his experts does not render counsel's performance ineffective. We need not decide whether this was the best possible choice, only that it was a professionally reasonable one. We view the decision to decline the continuance as a reasonable decision under the circumstances.

Finally, the appellant claims his trial defense counsel conceded the appropriateness of a punitive discharge against his wishes. After reviewing the record of trial, we do not agree. Trial defense counsel specifically argued, "while [appellant] desires to remain in the Marine Corps he understands that that's highly unlikely based on your verdict here. If you choose to discharge him, so be it."[22] In his sentencing recommendation at the end of the argument he argued for "a sentence to six months confinement and whatever other punishment you feel is appropriate."[23] At no point did the trial defense counsel request a punitive discharge or concede that one was appropriate. He merely acknowledged the probability of a punitive discharge given the members' findings and argued that if that did happen, a lower sentence to confinement was warranted. Even if this could be labelled a concession, it was realistic under the circumstances. We find it highly unlikely that any military members would have sentenced the appellant to nine years' confinement and not also have awarded a punitive discharge.

We find that the appellant's representation met the "objective standard of reasonableness" in light of "prevailing professional norms." *Strickland*, 466 U.S. 668, 688.

## F. Expert Testimony about Victim Behavior

The appellant claims the military judge abused his discretion when he allowed Captain Simmer to testify about the victim's behavior, improperly bolstering the victim's testimony. We find that the military judge did not abuse his discretion.

A military judge's decision to allow expert testimony is reviewed for an abuse of discretion. *United States v. Henning,* 75 M.J. 187, 190-91 (C.A.A.F. 2016). When reviewing for an abuse of discretion, we recognize the military judge has a range of choices, and we will not reverse the military judge simp-

---

[21] Appellate Exhibit XCIII at 20.

[22] Record at 1571.

[23] *Id*. at 1572.

ly because of a mere difference of opinion. *United States v. Sanchez,* 65 M.J. 145, 148-49 (C.A.A.F. 2007). In order for a military judge's decision to be reversed for an abuse of discretion, that decision must be arbitrary, fanciful, clearly unreasonable, or clearly erroneous. *United States v. Sullivan,* 74 M.J. 448, 454 (C.A.A.F. 2015).

Captain Simmer testified during the merits phase of the trial that the victim's actions were broadly consistent with someone who had experienced sexual trauma and that the trauma likely happened in the early part of 2011 based on her mental health records. The appellant objected at trial, citing MIL. R. EVID. 401 and 403. In overruling the objection, the military judge conducted a MIL. R. EVID. 403 balancing test on the record. Since it was on the record, we grant deference to his analysis. *United States v. Downing*, 56 M.J. 419, 422 (C.A.A.F. 2002).

Throughout Captain Simmer's testimony, the military judge repeatedly instructed the members that the witness was not a "human lie detector."[24] *See United States v. Mullins*, 69 M.J. 113, 117-18 (C.A.A.F. 2010) (finding no prejudice when members properly instructed on "human lie detector" testimony). At no point did the testimony devolve into the expert's opinion on the victim's credibility. He only testified that her behavior was consistent with someone who has experienced sexual trauma.

Importantly, the expert testimony was offered by the government in its case in rebuttal in response to the defense's theory that the victim fabricated her story. The government sought to explain her seemingly irrational behavior as highlighted by the defense. *United States v. Toro*, 37 M.J. 313, 315 (C.A.A.F. 1993) (describing improper bolstering as that which "occurs *before* impeachment, that is, when the proponent seeks to enhance the credibility of the witness before the witness is attacked") (emphasis added); *See also United States v. Tomlinson*, 20 M.J. 897, 900 (A. Ct. Crim. App. 1985) (finding that the government's expert witness improperly bolstered the credibility of the victim in the absence of any defense attack on the victim's testimony).

The expert witness' testimony was not offered to improperly bolster the credibility of the victim but was in response to the defense's impeachment efforts and theory of the case. More broadly, the ability of expert mental health professionals to testify that victims' behavior is broadly consistent with sexual trauma has long been recognized by the courts. *See, e.g., United States v. Raya*, 45 M.J. 251, 252-53 (C.A.A.F. 1996); *United States v. Lee*, 28 M.J. 52, 54-55 (C.M.A. 1989); *United States v. Carter,* 22 M.J. 771, 776 (A. Ct. Crim. App. 1986) (conducting a substantial survey of jurisprudence on expert

---

[24] Record at 1125, 1132, 1138.

psychiatrists' testimony in sexual assault cases); *Skidmore v. Precision Printing & Pkg., Inc.*, 188 F.3d 606, 618 (5th Cir. 1999); *Beauchamp v. City of Noblesville*, 320 F.3d 733, 745 (7th Cir. 2003). This precedential support, combined with the military judge's regular reminders to the members that they alone are responsible for judging witness credibility, convinces us that the military judge properly performed his role as gatekeeper and prevented any undue harm from accruing to the prejudice of the appellant.

**G. Defense Summaries of Text Messages and Evidence of the Victim's Husband's Infidelity**[25]

The appellant claims the military judge also abused his discretion by refusing to admit four defense exhibits as summaries under MIL. R. EVID. 1006. He also challenges the military judge's decision to deny the defense request to admit evidence that the victim's husband had recently had an extra-marital affair.

We review a military judge's decision to exclude evidence for an abuse of discretion. *United States v. Solomon,* 72 M.J. 176, 179 (C.A.A.F. 2013). As in the preceding AOE, we recognize that the military judge has a range of choices, *Sanchez,* 65 M.J. at 148-49, and their decision must be arbitrary, fanciful, clearly unreasonable, or clearly erroneous before we will reverse, *Sullivan,* 74 M.J. at 454.

Turning first to the summaries, three of the four summaries in question—Defense Exhibits C, D, and E for identification—consisted of summaries of the victim's text messages and phone calls with color-coding and labels added by the defense to show their interpretation of the evidence. The fourth exhibit—Defense Exhibit G for identification—consisted of a calendar with a tally, by day, of the victim's text messages, also color-coded by the defense. When these exhibits were offered, the military judge refused to admit them unless the defense removed their color-coding.[26] The defense declined to remove it. In making his ruling, the military judge recognized that *Crawford v. Washington,* 541 U.S. 36 (2004), did not apply to the defense. However, he found that the color-coding constituted an alteration of the underlying evidence that he had not customarily allowed either party to perform.

We find that the information in these proposed exhibits was already in evidence, so the exhibits would have been cumulative. The defense was free to state what they thought the texts would reveal in their opening statement

---

[25] This discussion includes AOEs 7 and 8.

[26] "So you can put all of that same information in as long as it is not color coded." Record at 1336.

and could argue their interpretation in their closing argument to the members. They were also free to use demonstrative exhibits during their closing argument, but they did not do so. Under these circumstances we do not find that the military judge's decision was arbitrary, fanciful, clearly unreasonable, or clearly erroneous. *Sullivan,* 74 M.J. at 454. He therefore did not abuse his discretion.

The appellant also challenges the military judge's decision to exclude evidence that showed that the victim knew her husband had an extra-marital affair. The defense articulated the relevance of this evidence as follows: "the relevance is it's certainly probative on [D.S.'s] state of mind and leaving her marriage of 26 years, moving out on her own, and perhaps we believe, sir, the evidence will show feelings . . . sexually liberated."[27] On appeal the appellant states that the evidence should have been admitted to show that the victim had a bias or motive to misrepresent her allegation against the appellant. MIL. R. EVID. 608(c).

The military judge excluded this line of questioning because he determined the information was irrelevant and that its probative value was substantially outweighed by the danger of harassing the witness and distracting the members. He further explained that if the information later became relevant, the defense could recall the witness. We agree with the military judge that the evidence of her husband's affair was irrelevant, risked confusing the members, and risked undue harassment of the witness with no logical link to her motive to fabricate. MIL. R. EVID. 401, 403. We do not find his decision to be arbitrary, fanciful, clearly unreasonable, or clearly erroneous.

## H. Post-Trial Processing and *United States v. Moreno*

The appellant complains that his post-trial right to due process has been violated due to the length of time it has taken the government to process his court-martial.

We review post-trial speedy trial clock violation claims *de novo. United States v. Moreno,* 63 M.J. 129, 135 (C.A.A.F. 2006). The right to a timely post-trial process is implied in the due process clause of the Fifth Amendment. *Id.* at 145. When analyzing post-trial delay we utilize the four *Barker* factors, which are the length of the delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant. *Barker v. Wingo,* 407 U.S. 514, 530 (1972). With regard to the first factor, post-trial delay is presumptively unreasonable if it takes longer than 120 days from sentence to convening authority action. Here, both parties agree that the post-trial delay

---

[27] Record at 730.

is presumptively unreasonable under *Moreno*. Thus, the government has the burden to rebut that presumption, if it can.

The 120-day presumption under *Moreno* runs from date of sentencing to the date of the convening authority's action. The appellant was sentenced on 29 April 2015, and the convening authority's action was signed on 20 November 2017, a duration of 937 days.

A close examination of the record of trial shows that this case involved significant and time-consuming post-sentencing litigation initiated by both the appellant and the government. This litigation included post-sentencing motions by the defense, a government extraordinary writ to this court, a government writ appeal to C.A.A.F., and the appellant's petition for certiorari to the Supreme Court. We have examined the timeline for these post-sentencing actions and find there was no unreasonable delay from the date of sentencing, 29 April 2015, to the date that this court issued a remand order to return the record of trial to the convening authority, 22 May 2017.[28]

Finding no unreasonable delay prior to the issuance of our remand order, we now examine the delay between 22 May 2017 and the date the convening authority took action in this case—20 November 2017. The following timeline contains the relevant post-trial processing dates following this court's remand order and the cumulative delay from that date:

| 22 May 2017 | NMCCA Remand Order | 0 days |
|---|---|---|
| 11 Sep 2017 | Convening Authority Receives Order | 112 days |
| 28 Sep 2017 | Corrected Results of Trial Memo | 129 days |
| 29 Sep 2017 | Appellant Dismisses Detailed DC | 130 days |
| 2 Oct 2017 | Record of Trial Served on Defense | 133 days |
| 6 Oct 2017 | New Defense Counsel Detailed | 137 days |
| 6 Oct 2017 | Staff Judge Advocate Recommendation | 137 days |
| 7 Oct 2017 | SJAR Served on Defense | 138 days |
| 16 Oct 2017 | Clemency Request Submitted | 147 days |
| 17 Oct 2017 | Victim Matters Submitted | 148 days |

---

[28] Delays due to stays by appellate courts are generally not attributable to the government unless the delay is frivolous or due to bad faith. R.C.M. 707(c); *United States v. Ramsey,* 28 M.J. 370, 373 (C.M.A. 1989). There is no argument that the government's extraordinary writ and subsequent litigation were frivolous or due to bad faith. Therefore, we do not attribute those delays to the government or find them unreasonable under *Moreno*.

1   Nov 2017   Addendum SJAR Signed ................................ 163 days

2   Nov 2017   Addendum SJAR Served on Defense ............. 164 days

10  Nov 2017   Additional Matters from Appellant................ 172 days

20  Nov 2017   Convening Authority Action........................... 182 days

We have determined that, with the exception of the 112-day delay between the issuance of our order and the receipt of that order by the convening authority, each of these post-trial actions are reasonably diligent on their face. The government fails to explain why it took 112 days to accomplish the simple ministerial task of delivering our order and the remanded record of trial to the convening authority. Based solely on this unexplained 112-day delay, we find that the first *Barker* factor favors the appellant. Based on the unexplained nature of the 112-day delay, the second *Barker* factor, the reason for the delay, also favors the appellant.

Next, we consider whether the appellant asserted his right to a timely review and appeal. Until this appeal, the only occasion when the appellant asserted his right to timely post-trial processing was on 16 October 2017.[29] After receiving this assertion of his speedy post-trial right, the convening authority took action in thirty-six days. We recognize that the "the right to a speedy trial is unique in its uncertainty as to when and under what circumstances it must be asserted or may be deemed waived." *Barker,* 407 U.S. at 528-29. Nonetheless, we determine that the third *Barker* factor weighs in favor of the government.

The last *Barker* factor to consider is the prejudice of the delay on the appellant. In *Moreno,* the Court recognized three interests to consider when evaluating prejudice. These are: (1) prevention of oppressive incarceration pending appeal; (2) minimization of anxiety and concern of those convicted awaiting the outcome of their appeals; and (3) limitation of the possibility that a convicted person's grounds for appeal, and his defenses in case of reversal and retrial, might be impaired. *Moreno,* 63 M.J. at 138-39.

The first interest heavily weighs against the appellant. In order to show an appellant was deprived of due process and consequently subject to oppressive incarceration, there must be error in the trial or process that leads to confinement in the first place. *United States v. Toohey,* 63 M.J. 353, 361 (C.A.A.F. 2006). If there is no prejudice from error at the trial level, then it cannot be said the confinement is oppressive because the appellant is simply serving the sentence that was fairly adjudged. The appellant complains that he suffered in confinement due to not receiving command visits, but his com-

---

[29] Staff Judge Advocate's Recommendation (SJAR), Nov. 1, 2017 at encl. 2, pg. 9.

mand was the brig since his adjudged sentence of confinement was over thirty-one days. SECNAVINST 1640.9C, para. 7403 (Jan. 30, 2006). His old command had no further obligation to visit him in the brig.

The appellant suffered no greater time in confinement due to the delay in post-trial processing. Therefore, this interest does not favor him.

The second interest to consider is the minimization of anxiety and concern regarding the outcome of appeal. The anxiety or concern must be particularized and distinguishable from the normal anxiety experienced by prisoners awaiting an appellate decision. *Moreno,* 63 M.J. at 140. The appellant does not demonstrate any anxiety or concern that is particularized to his specific situation. This interest does not favor the appellant.

The last interest to consider is the degraded ability of the appellant to make his case on appeal or to make a defense at a future trial. We can find no such degradation in his ability to make a case on appeal. The appellant complains that his cell phone is now missing, but he does not explain why he did not use the cell phone as evidence during his trial. This interest does not favor the appellant.

Balancing the four *Barker* factors, we determine that, although the post-trial process included a 112-day unexplained delay, the appellant is not entitled to relief because he did not assert his right in a timely fashion and he was not prejudiced in any way by the delay. In short, we find that the appellant is in exactly the same position he would have been in had there been no 112-day delay in processing his case.

## I. Specification Four of Charge II is Factually and Legally Sufficient

We review questions of legal and factual sufficiency *de novo*. Art 66(c), UCMJ; *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002).

"The test for legal sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Robinson*, 77 M.J. 294, 297-98, (C.A.A.F. 2018) (quoting *United States v. Rosario*, 76 M.J. 114, 117 (C.A.A.F. 2017)).

The test for factual sufficiency is whether "after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [this court is] convinced of appellant's guilt beyond a reasonable doubt." *Rosario*, 76 M.J. at 117 (citation, internal quotation marks, and emphasis omitted). In conducting this unique appellate function, we take "a fresh, impartial look at the evidence," applying "neither a presumption of innocence nor a presumption of guilt" to "make [our] own independent determination as to whether the evidence constitutes proof of each required element

23

beyond a reasonable doubt." *Washington*, 57 M.J. at 399. Proof beyond a reasonable doubt does not mean, however, that the evidence must be free from conflict. *United States v. Goode*, 54 M.J. 836, 841 (N-M. Ct. Crim. App. 2001).

In order to sustain the appellant's conviction for Specification 4 of Charge II,[30] the government must have proven beyond a reasonable doubt that: (1) The appellant engaged in sexual contact on the victim by intentionally touching her genitalia, groin, breast, inner thigh, buttocks, and anus; and (2) He did so by placing the victim in fear of physical injury other than death or grievous bodily harm. 10 U.S.C. § 920(h) (2006); MANUAL FOR COURTS-MARTIAL (MCM), UNITED STATES (2008 ed.), Part IV, ¶45.b.(8)(a); Charge Sheet.

After carefully reviewing the record of trial and considering the evidence in the light most favorable to the prosecution, we are convinced that a rational fact-finder could have found all the essential elements beyond a reasonable doubt. Additionally, after weighing the evidence and having made allowances for not having personally observed the witnesses, we are convinced beyond a reasonable doubt of the appellant's guilt. In particular, we find the evidence convincing that while touching D.S.'s genitalia, groin, breast, inner thigh, buttocks, or anus, the appellant placed D.S. in fear of physical injury.

## J. Appellant's Adjudged Sentence is Appropriate

We review sentence appropriateness *de novo. United States v. Lane*, 64 M.J. 1, 2 (C.A.A.F. 2006). "Sentence appropriateness involves the judicial function of assuring that justice is done and that the accused gets the punishment he deserves." *United States v. Healy*, 26 M.J. 394, 395 (C.M.A. 1988). This requires our "individualized consideration of the particular accused on the basis of the nature and seriousness of the offense and the character of the offender." *United States v. Snelling*, 14 M.J. 267, 268 (C.M.A. 1982) (citation and internal quotation marks omitted). In making this assessment, we analyze the record as a whole. *Healy*, 26 M.J. at 395-97. Despite our significant discretion in determining sentence appropriateness, we may not engage in acts of clemency. *United States v. Nerad*, 69 M.J. 138, 146 (C.A.A.F. 2010).

Having given individualized consideration to the nature and seriousness of these crimes, the appellant's record of service, and all matters contained in the record of trial, including matters submitted by the appellant in extenuation and mitigation, and the victim's testimony during sentencing, we con-

---

[30] Although the appellant was also found guilty of Specification 5 of Charge II, the military judge conditionally dismissed that specification as duplicitous with Specification 4 of Charge II.

clude the sentence as approved by the CA is not inappropriately severe and is appropriate for this offender and his offenses. *United States v. Baier*, 60 M.J. 382, 384-85 (C.A.A.F. 2005); *Healy*, 26 M.J. at 395-96; *Snelling*, 14 M.J. at 268. Granting sentence relief at this point would be to engage in clemency, which we decline to do. *Healy*, 26 M.J. at 395-96.

### K. Cumulative Error

The appellant finally asserts that his convictions and sentence should be set aside because of cumulative error. We review allegations of cumulative error *de novo*. *United States v. Pope*, 69 M.J. 328, 335 (C.A.A.F. 2011). "Under the cumulative-error doctrine, 'a number of errors, no one perhaps sufficient to merit reversal, in combination necessitate the disapproval of a finding.'" *Id.* (quoting *United States v. Banks*, 36 M.J. 150, 170-71 (C.M.A. 1992)).

"Courts are far less likely to find cumulative error where evidentiary errors are followed by curative instructions or when a record contains overwhelming evidence of a defendant's guilt." *United States v. Dollente*, 45 M.J. 234, 242 (C.A.A.F. 1996) (internal quotations omitted). An appellate court will reverse only if it finds the cumulative errors denied the appellant a fair trial. *Id.* at 242 (citing *Banks*, 36 M.J. at 170-71).

Having found none of the appellant's individual allegations of error to be meritorious, there is no need for us to analyze the case further under the cumulative-error doctrine. *United States v. Gray*, 51 M.J. 1, 61 (C.A.A.F. 1999).

### III. CONCLUSION

After careful consideration of the record and briefs of appellate counsel, we have determined that the approved findings and sentence are correct in law and fact and that no error materially prejudicial to the appellant's substantial rights occurred. Arts. 59 and 66, UCMJ. Accordingly, the findings and sentence as approved by the convening authority are **AFFIRMED**.

Chief Judge WOODARD and Senior Judge FULTON concur.

FOR THE COURT:

RODGER A. DREW, JR.
Clerk of Court